Robert HERVEY, Jr. and Robert Walker, Plaintiffs,

v.

CITY OF LITTLE ROCK, Defendant,

Robert McGruder, Belinda Mitchell, Leo Anderson and Jesse Machenry Johnson, Jr., Intervenors.

Mollie WHITE, Plaintiff,

v.

CITY OF LITTLE ROCK, ARKANSAS; Donald Mehlburger, Charles Bussey, Myra Jones, A.M. Sandy Keith, Lottie Shackleford, John Langston and Webster Hubbell, Individually and in their Official Capacity as Members of the Board of Directors of the City of Little Rock, Arkansas, Defendants.

Estella ROBINSON, Plaintiff,

v.

CITY OF LITTLE ROCK, Defendant.

Nos. LR–C–80–44, LR–C–79–235 and LR–C–80–311.

United States District Court, E.D. Arkansas, W.D.

Feb. 10, 1984.

---

P.A. Hollingsworth, Janet Pulliam, John Walker, Richard Quiggle, Little Rock, Ark., for plaintiffs and intervenors.

Philip K. Lyon, Stephen W. Jones, R. Jack Magruder, City Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### I.

### THE PLEADINGS

On January 24, 1980 two black males, Robert Hervey and Robert Walker, filed a class action complaint (No. LR–C–80–44) against the City of Little Rock claiming violations of Title VII and 42 U.S.C. §§ 1981 and 1983. The city was charged with discrimination in classification, compensation, hiring, testing, pay, transfer, promotion and performance evaluation with respect to members of the class. With regard to class representative Hervey, it was alleged that he was hired as a mechanic in 1973 and had been denied promotion on account of his race. It was alleged that class representative Walker had been a full-time mechanic until he was injured on the job on December 4, 1978, that he was denied transfer and light work, which had been accorded to whites similarly situated, and that he was subject to a racist attitude on the job. Plaintiffs prayed for monetary and injunctive relief. The attorneys for the plaintiffs were Perlesta A. Hollingsworth and Janet Pulliam. On February 13, 1980 an answer was filed on behalf of the City of Little Rock by City Attorney Jack Magruder and Philip Kaplan denying the allegations in the complaint.

On April 11, 1980 Philip K. Lyon and Stephen Jones were substituted as counsel for the City in the place of Philip Kaplan. Plaintiffs through their attorneys moved for class certification on May 23, 1980. On August 19, 1981 Mr. Hollingsworth and Ms. Pulliam filed a petition that Robert McGruder be permitted to intervene in the class action. By an agreed stipulated order dated October 26, 1981 the class action case was consolidated with two individual claims of discrimination against the City of Little Rock, No. LR–C–79–235 in which Mollie White was the plaintiff and LR–C–80–311 in which Estella Robinson was the plaintiff. These two plaintiffs were represented by Messrs. John Walker and Richard Quiggle. In the same order it was agreed that Robert McGruder and Belinda Mitchell might intervene in the class action and the following classes and subclasses were stipulated:

1. All nonuniformed, nonmanagement, nonsupervisory black persons employed by the defendant who have allegedly been discriminated against because of their race in promotions or transfers

since January 24, 1977 for purposes of 42 U.S.C. § 1981 and since 180 days prior to May 28, 1981 for purposes of 42 U.S.C. § 2000e.

2. All nonuniformed, nonmanagement, nonsupervisory black persons employed by the defendant who have allegedly been discriminatorily discharged because of their race from their employment since August 19, 1979 for purposes of 42 U.S.C. § 1981 and since 180 days prior to May 28, 1981 for purposes of 42 U.S.C. § 2000e.

3. All nonuniformed, nonmanagement, nonsupervisory black persons employed by the defendant who have allegedly been discriminated against in the terms, conditions and privileges of their employment because of their race, for purposes of injunctive relief only, since January 24, 1977 for purposes of 42 U.S.C. § 1981 and since 180 days prior to April 2, 1979 for purposes of 42 U.S.C. § 2000e.

The class representatives were stipulated as follows:

Fourth, plaintiffs Hervey and Robinson are the proper class representatives for the subclass 1 above. Plaintiff McGruder and intervenor Mitchell are the proper class representatives of subclass 2 above. All of the plaintiffs are proper class representatives for subclass 3 above.

Fifth, each of the plaintiffs will continue to prosecute and try their individual claims of racial discrimination, and the plaintiffs Mollie White and Estella Robinson will also continue to prosecute and try their individual claims of sexual discrimination.

Sixth, the intervention of Robert McGruder, who has already applied for intervention, and of Belinda Mitchell, who has not yet applied for intervention, is proper and will be allowed. Mr. McGruder will be allowed to intervene for both class and individual purposes, and Ms. Mitchell will be allowed to intervene for the purposes of her individual case and as a class representative for subclass 2.

It was agreed that the matter would first be tried on liability and later on damages and remedies.

Mr. Hollingsworth and Ms. Pulliam petitioned that Leo Anderson and Powell Tidwell be permitted to intervene in this case. The petition was granted as to Anderson and denied as to Tidwell on May 11, 1982. On June 1, 1982 these same attorneys petitioned that Jesse MacHenry Johnson, Jr. be permitted to intervene. On June 2, 1982 this motion was granted. Johnson's intervention complaint was based on failure to promote, as was the individual complaint of class representative Estella Robinson. Mollie White was not a class representative.

During the course of this litigation, considerable antagonism developed among the attorneys for the original class plaintiffs, Walker and Hervey, the intervenors McGruder, Anderson and Johnson (Hollingsworth and Pulliam) on the one hand and the attorneys for the plaintiffs Robinson and White in the consolidated cases and the intervenor Mitchell (Walker and Quiggle). The animosity culminated in Walker and Quiggle's filing a motion to disqualify Hollingsworth and Pulliam for conflict of interest because Philip Kaplan, a present associate of Hollingsworth, had filed an answer to the class action suit and had deposed Mollie White, a plaintiff in No. LR–C–80–311. The answer filed by Mr. Kaplan to the class action was a pro-forma general type pleading and was made on February 13, 1980, nineteen days after the complaint was filed. At that time Mr. Kaplan was not associated with either Mr. Hollingsworth or Ms. Pulliam. A month later Mr. Kaplan withdrew from the case and had no further association with it. Over a year later Mr. Kaplan and Mr. Hollingsworth merged their firms. With regard to the White deposition, I did not regard the taking of her deposition as significant because she is not a class representative and is only pursuing an individual claim. Judge Overton had ruled in Ms. White's individual case that she could not be a class representative because of Mr. Walker's failure to timely file a motion for class certification and that her case could

only proceed individually. The order was upheld by the Eighth Circuit on October 15, 1980. The stipulated class certification order recognized that Ms. White is not involved in the class action litigation with the other plaintiffs. The City has waived any objection of the participation of Mr. Hollingsworth and Ms. Pulliam in this matter. The motions and responses filed in this phase of the case were replete with charges and countercharges of "professional misconduct," "reprehensible conduct," "spurious allegations" and the like. Because of the background set forth above and because I seriously doubted Mr. Walker's standing to challenge representation of the other plaintiff, on January 19, 1983 I denied the motion to disqualify but at Mr. Walker's request granted permission to take an interlocutory appeal to the Eighth Circuit. Mr. Walker duly docketed the appeal. That court dismissed the appeal on March 7, 1983 "for the reason that appellants have failed to make timely application for interlocutory appeal."

Trial of this matter was begun on December 12, 1983. Apparently there was considerable misunderstanding about settlement of the controversy. Mr. Hollingsworth and Ms. Pulliam advised me immediately prior to trial that they had been led to believe the case was settled. The antagonism and ill feeling among the attorneys have undoubtedly contributed to the manner in which this class action has been handled, which will be discussed, *infra*. I instructed counsel first to proceed with the discharge subclass. Trial of this matter continued until December 29, 1983 when all the discharge witnesses and experts for the plaintiffs on discharge subclass had been heard. I informed counsel that I had grave doubts concerning the maintenance of the discharge subclass and called for briefs from the parties which have now been submitted, and I am ready to rule as to the discharge subclass.

## II.

### PRELIMINARY OBSERVATIONS

Clearly, I must now decertify the discharge subclass stipulated in this case. I may also later decertify the other subclasses but have reluctantly concluded that in all fairness the attorneys in the original class action suit should be given the opportunity to present additional testimony as to the remaining "promotion" and "terms and conditions" subclasses. When this case was called for trial, Mr. Hollingsworth advised the court that he understood that it had been settled and he had released his witnesses. Mr. Hollingsworth had also just been appointed to an interim term on the Supreme Court of Arkansas and will be out of practice until January 1, 1985. It will be necessary for other members of his firm to assume responsibility for this litigation. I will hold the class action aspect of the case open to receive any additional testimony as to the "promotion" and "terms and condition" subclasses. Expert testimony was heard on the promotion issue and some anecdotal testimony on promotions was heard from witnesses also testifying with regard to the discharge subclass.

The discharge subclass was represented only by attorneys John Walker and Richard Quiggle. The only representative remaining for this class was Belinda Mitchell, since I had granted summary judgment as to Robert McGruder. Except for Walker and Quiggle, all the other attorneys in this matter disclaimed responsibility for the discharge subclass. After the testimony of James Metzger, the only expert witness presented by Messrs. Walker and Quiggle on the discharge subclass (although he purported to cover all aspects of the class action), I had grave reservations about the viability of the class and particularly the discharge subclass. I instructed the attorneys for the discharge subclass to present all their testimony, expert and anecdotal, and at the end of this testimony I would rule on the viability of the discharge subclass. With this understanding Mr. Walker and Mr. Quiggle called 20 anecdotal witnesses in addition to the expert witness, Mr. Metzger, and their class representative, Ms. Belinda Mitchell. Testimony on the discharge subclass consumed three

weeks and constituted an incredible waste of judicial time. Not only was the expert's testimony methodologically unsound but it was in large measure founded on a data base laced with an unacceptable level of errors. It would probably be unfair to place the entire blame on Mr. Metzger. The discharge class representative and her attorneys must bear a large share of the responsibility. Metzger was unprepared on a number of important facets of the case. Obviously, he had not been given essential portions of the proofs of discovery; he was unfamiliar with the class stipulation and the pleadings in the case. He was woefully underfinanced for the work for which he had been retained.

As a result of these significant shortcomings in the manner in which the case was presented, the testimony of Metzger is subject to many infirmities and methodological errors, including the following.

a. His data base was not confined to the relevant time frame as defined in the stipulated order but contained data going back as far as World War II. His regression tables, offered to show the effect of race on promotion, included all grade changes for all employee job histories with no attempt to limit the analysis to promotion occurring within the relevant time frame.

b. His data base included as promotion all grade movements including reclassification, career ladder upgrades, lateral transfers and even demotions.

c. He coded into his data base all management and supervisory employees (even the City Manager, City Attorney and City Engineer) although these individuals were specifically excluded from the class stipulation.

d. He did not "tack tenure" for rehired employees who constituted a substantial portion of the data base. Each employment period was treated separately for tenure purposes. This deficiency was blamed by Metzger on lack of funding.

e. Instead of using a list provided by the City of all employees terminated for cause within the relevant time frame, which list included the race, name of the supervisor, and reason for discharge, Metzger included in his data base all employees terminated within proximity to a disciplinary episode. This was shown to be an unsound approach replete with coding errors.

f. Cross examination of Metzger in regard to his data base revealed an unacceptable quantity of errors. Some errors are to be expected in a data base of this size, but the number and nature of the errors exposed in this case passed beyond the pale.

g. Many of the errors could have been avoided if usual methodological checks had been made on the data base. However, there were no systematic data verification checks, no range checks, no audit trails, and no log on the resolution of coding problems. Some of their deficiencies were blamed by Metzger on the lack of financial resources.

When cross-examination revealed the multiplicity of errors and conclusions in Mr. Metzger's exhibits, he submitted three revised sets of exhibits during the course of the trial, all significantly at variance with the exhibits submitted to defense counsel the day before the trial. He was not forthcoming in providing defense counsel with the backup data. I am not satisfied that any of his exhibits presented to the Court contain data from a fully corrected, demonstrably reliable data base. Defense counsel has moved that Metzger's testimony be stricken. I will not strike it, but it deserves and will be accorded little weight in this litigation.

Most of the other testimony advanced on behalf of the discharge subclass is relevant only as background and is flagrantly deficient even in this respect. It merits severe criticism for gross abuse of judicial time and economy and for unduly increasing the cost of this litigation. In the first place, the class representative Ms. Belinda Mitchell was not discharged at all but resigned her job as is apparent in the findings of fact, which are set out *infra*. Of the remaining twenty witnesses presented on behalf of the discharge class, five like Ms.

Mitchell were not discharged at all but resigned their position with the City (Doris Watson, Theodore Holmes, Virgilene Hampton, Mae Rosby, and Danny L. Johnson). Three (Melvin Rodgers, Sandra Donaldson and Gladys Hayes) are still working for the City, including a supervisor who is not within the stipulated class (Gladys Hayes). One was not discharged but is on long-term disability (James Long). Four additional dischargee-witnesses were not even employed by the City but were CETA employees (William Howard, Bennie Thompson, Wayman Camp, and Gary Saulsberry). Not only were they CETA employees, but all these discharges occurred prior to the stipulated time frame. Four more actual City employees (Henry Lee Hervey, Joe Jackson, Marion Robinson, and Mary Norfleet) were discharged outside the stipulated time frame making a total of eight witnesses whose discharges were not within the proper time period. Thus, out of the twenty-one witnesses called to substantiate the discharge subclass, only three were actually discharged within the pertinent time period. An examination of these cases has convinced me that none of the three was discharged as a result of racial discrimination. While this testimony regarding non-class members may have some value as background and to show the attitude of the City, there must be more than a mere handfull of people identified within the stipulated class to comply with the requirements of Rule 23. Parenthetically, it may be stated that the testimony of the eighteen non-class members was not impressive. In most cases the discipline involved or the discharges effected were justified.

## III.

## FINDINGS OF FACT

## BELINDA MITCHELL

### (Class representative)

1. Belinda Mitchell was the only remaining representative of the discharge class since I granted summary judgment as to Robert McGruder.

2. Belinda Mitchell was not discharged but voluntarily resigned her position with the City of Little Rock.

3. Her claim that she was constructively discharged is without basis since I find that the City's discipline of Ms. Mitchell was not specifically intended to force her to resign.

4. The discipline assessed against her by the Civil Service Commission was justified by the evidence. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981). During the last two years of her employment, there was clear and persuasive evidence of a serious and continuing pattern of disciplinary problems culminating in open insubordination. (DX 21A–21FFF).

5. I find that on December 29, 1980 Ms. Mitchell refused to follow the explicit directions of her immediate supervisors. (DX 21M).

6. Ms. Mitchell was rude and uncooperative toward other employees. (DX 21R, DX 21S).

7. On March 16, 1981 she was given a written reprimand by her department head, the City Engineer, for (1) being frequently away from her work station without justification, (2) excessive use of the telephone for personal business with one call lasting 45 minutes, (3) failing to perform work duty, (4) insubordination with respect to her immediate supervisor, and (5) failure to get along with her co-workers. (DX 21T).

8. The next day after this written reprimand Ms. Mitchell refused to carry out the directives of her supervisor. (DX 21W).

9. Ms. Mitchell appealed the written reprimand to City Manager Mahlon Martin, who is black. Mr. Martin sustained the disciplinary action and stated: "The evidence presented by management concerning your behavior toward supervising personnel on different occasions was of such impact that a more severe disciplinary action including termination would have been justified." (DX 21X).

10. During the next several months there is documentation in the files of con-

duct on Ms. Mitchell's part that can only be described as rude (DX 21EE) and uncooperative (DX 21HH). She failed to do her work properly (DX 21HH, 21LL, 21MM, and 21NN), overstayed her lunch hours and break times (DX 21II, 21JJ) and made an inordinate number of personal phones calls (DX 21JJ).

11. On June 30, 1981 the City Engineer wrote Ms. Mitchell that he had decided to terminate her for the following reasons:

1. You have continued to absent yourself from your work station for personal reasons, and without proper coordination with the Engineering Administrative Assistant or myself.

2. You have failed to keep your filing current, with the result that I have, on occasion, been delayed in retrieving needed documents.

3. You continue to make frequent and lengthy personal telephone calls during office hours, which has adversely affected the productivity of this office.

4. You have continued to display a reluctance to accept work and the work priorities established by the Engineering Administrative Assistant and by me.

5. You have continued to demonstrate a less than cordial and responsive attitude with respect to accepting work from other members of the Engineering Division, with the result that work coordination within the Division has been disrupted. (DX 21OO)

12. The Civil Service Commission reduced the discipline to a 30-day suspension. (DX 21PP).

13. On September 29, 1981 Ms. Mitchell was terminated by the department personnel director for abuse of sick leave policy. During sick leave she worked for another employer (DX 21TT). This discipline was upheld by the City Engineer (DX 200). The action was sustained by the City Manager (DX 21WW), but the Civil Service Commission reduced the termination to a two-day suspension (DX 21XX).

14. On February 10, 1982 Ms. Mitchell was given an oral reprimand for the following conduct toward her department head:

During a meeting with you in my office, 2/8/82, you repeatedly interrupted me and protested the purpose of the meeting to the extent that the meeting became unpleasant and unproductive. This action on your part was tantamount to insubordination. You are hereby warned that a recurrence of the above or any other infractions will result in further disciplinary action. (DX 21YY)

15. On June 18, 1982 Ms. Mitchell was given a ten-day suspension for insubordination by the City Engineer (DX 21BBB). The reasons are detailed in his letter of the same date:

1. You acted in a manner showing extreme disrespect when I gave you a tape to transcribe, refusing to acknowledge my presence and the directions I was giving you all the while continuing a personal conversation.

2. You refused to discuss this incident later in the day, even after repeated requests.

3. You refused to accept a tape from me for transcribing, telling me instead that I would have to write it out in longhand.

4. You refused to leave your work station and go home for the remainder of the day, after I had requested you to do so several times and after I had given you a copy of a leave form placing you on Administrative Leave (with pay) for the afternoon. (DX 21CCC)

16. The Civil Service Commission increased the suspension to 30 days (DX 21EEE).

17. Ms. Mitchell submitted a letter of resignation on July 31, 1982 (DX 21FFF).

### MYRA REED BUTLER

1. Myra Reed Butler, a black female, was hired in 1974 by the City as the Switch-

board Operator/Receptionist at the East Little Rock Community Center.

2. She was discharged for being habitually late in the mid-1970's by her supervisor Mable Mitchell, a black female, but this was reduced to a written reprimand and she was reinstated after a hearing on the appeal of her discharge before the Personnel Director, Joe Denny, white male.

3. During her employment, she applied for a promotion to a position in the CETA Administration Department of the City. She was denied this promotion but admits it was awarded to another black female.

4. In 1979, she requested a transfer to the position of Switchboard Operator/Receptionist in the General Services Department. She was interviewed by the Department Director, Melvin White, white male, who later informed her through his secretary, Louise Prickett, white female, that she would receive the position once approval was received from her supervisor, Mable Mitchell. She testified that she was told that she did not receive the position because Mable Mitchell was not available to give a recommendation on her behalf and Ms. Butler's Department Director, Nathaniel Hill, black male, refused to do so in Ms. Mitchell's absence.

5. Within a month the position was again vacant and Louise Prickett informed Ms. Butler the position was hers if her supervisors concurred. Ms. Butler testified that the reason she was denied the position was because Nathaniel Hill told the General Services Department that Ms. Butler was not qualified for the position. During her employment, however, Ms. Butler's position was upgraded from a beginning grade of F–2 to a grade of F–4 and she received all upgrades. (DX 1–7).

6. Ms. Butler testified she had continuing problems with her supervisor, Mable Mitchell. Her record confirms that she was repeatedly disciplined by Ms. Mitchell for various reasons: October 7, 1976 for tardiness (DX 93); April 28, 1977 for personal telephone calls and failure to relay messages (DX 94); November 2, 1978 for tardiness, excessive absenteeism and failure to relay messages (DX 95); and September 14, 1981 for tardiness and excessive absenteeism (DX 96).

7. On July 11, 1983 she was discharged by Ms. Mitchell for the third offense of failing to perform her assigned duties. (DX 99). This was preceded by an oral reprimand on June 3, 1983 and a later written reprimand (DX 98), both from Ms. Mitchell and both for failing to perform her assigned duties. Both the oral and written reprimands, as well as the termination letter, were signed by Ms. Butler and she does not deny receiving them.

8. Ms. Butler claims that she could not have been responsible for the conduct for which she was given the written reprimand. She further alleges that these disciplinary actions and her subsequent discharge occurred in retaliation for her participation in this action. Given her long record of disciplinary actions dating back to 1976, four years before this action was filed, such an allegation is without credibility as is her assertion that she was not responsible for the conduct for which she was discharged. Even if the latter were true, she does not deny she committed the other acts for which she was disciplined and this disciplinary record justified her subsequent discharge.

9. Ms. Butler has failed to provide any probative evidence that she was a victim of racial discrimination. Those white individuals involved in her allegations, by her own admission, treated her favorably—Joe Denny reinstated her and Melvin White was prepared to transfer her to a vacancy in his department. On the other hand, her black supervisors, Mable Mitchell and Nathaniel Hill, were responsible for all the negative actions of which she complains. It is notable, too, that she never filed an EEOC charge concerning any of her complaints nor utilized the appeal procedures available to her. Given her long history of disciplinary problems and her failure to show that her supervisors treated white employees more favorably, her testimony fails to indicate racial discrimination against her or other blacks.

## ROBERT THOMAS

1. Robert Thomas, a black male, came to work for the City on April 11, 1977 as a CETA employee in the Parks and Recreation Department.

2. Mr. Thomas was ultimately terminated in 1979.

3. A long and justifiable pattern of employee discipline was visited upon Mr. Thomas.

4. He received a written warning on July 31, 1978 for being late to work 10 times in July, 1978. (PX 84).

5. He was suspended for five days on October 13, 1978 for tardiness. (PX 85). He did not appeal that suspension to the Civil Service Commission, the City Manager or file a grievance with the union.

6. Seven months later on May 8, 1979 he was suspended for five days for failure to follow orders falsely reporting that he had performed work on more than two occasions, arguing with his supervisor, and showing a lack of concern and cooperation on the job. (PX 87). Mr. Thomas appealed to the City Manager, Carlton McMullin, white male, who reduced that suspension to a three day suspension. (PX 88–89). He did not appeal that decision to the Civil Service Commission.

7. Mr. Thomas was given a written warning about his attendance problems on September 24, 1979. (PX 93). A union representative, Mr. Osler, black, was present at the time Mr. Thomas received his written warning. Prior to the written warning he had come in late four days in a row. He had also left early on at least one occasion after being told not to do so. Mr. Thomas did not file a grievance with the union or complain to any union officials or Parks supervisors about his written warning.

8. On November 29, 1979 he was suspended and subsequently terminated as a result of numerous problems he had while employed. (PX 90). Mr. Thomas had been told to bring a doctor's note in to justify his sick leave. After being told numerous times to obtain a slip, he stated that he would get one from the V.A. Hospital. Mr. Thomas gave the personnel at Parks and Recreation several varying stories as to why he was absent from work. He also falsely told his supervisor that he was unable to get a slip from the doctor because he had left it at home and his sister had cleaned the house and lost the slip. Mr. Thomas testified on the stand that he had forged the doctor's slip and signature and made these false statements because he wanted to keep his job. Mr. Thomas appealed his termination to the City Manager who subsequently upheld it. (PX 92). Mr. Thomas also appealed his termination to the Civil Service Commission, and it was again upheld. Mr. Thomas did not file a grievance with his union even though the union steward and the union president at the time were black. Mr. Thomas testified that the union did not adequately represent him.

9. Mr. Thomas' testimony, when viewed in light of his numerous problems and his frank admission that he deliberately misrepresented facts to his supervisors and participated in a forgery, lacks credibility. I find that Mr. Thomas was not discriminated against by the City of Little Rock.

## ETHEL STEGALL

1. Ethal Stegall, black female, first began working for the Little Rock Municipal Court as a CETA public service employee on October 11, 1979. (PX 72—Temporary Appointment Form dated October 11, 1979). As such she was aware that she was not a regular City employee and that her position was temporary. (PX 72—CETA Acknowledgment Form).

2. While Jack Holt, Sr. was Municipal Judge, he made several requests that the City create a permanent position for Ms. Stegall without success. As a result even after she was given extensions, her CETA employment was to be terminated on January 31, 1981. (PX 72—CETA Public Service Extensions Form; 10–28–80 letter to Judge Holt).

3. In January, 1981 Judge Allen Dishongh took office succeeding Judge Holt. Ms. Stegall testified that Judge Dishongh accepted the resignation of every person employed by Judge Holt except herself. He met with Ms. Stegall and asked her to continue her employment with his staff. Judge Dishongh was able to get the City to provide a permanent position for Ms. Stegall and as soon as her CETA funding expired, he hired her into this position as an Office Assistant I, pay grade F-3. (PX 72—Personnel Appointment Form dated 2-6-81). This was effectively a promotion for Ms. Stegall since her CETA position had a pay grade of F-2. (PX 72—Temporary Appointment Form dated 1-13-81).

4. As she admitted during her testimony, Judge Dishongh was not compelled to hire her for this permanent position. He could have allowed her to be terminated by CETA when her appointment expired on January 31, 1981 and simply have hired someone else.

5. During her employment she contends she was denied two promotions because of her race. First, she stated she asked to be promoted to the position of Probation Officer but was told by Judge Dishongh he had already decided on his staff. She asserts that the subsequent hiring of Probation Officers indicates the Judge's explanation was not truthful. However, she did not establish that she was qualified for the position. She admits that a Probation Officer must be able to travel at all hours of the day and night to meet probationers and police officers but admitted she did not have a drivers' license. Ms. Stegall's testimony does not indicate racial motivation behind Judge Dishongh's decision, particularly in light of her being the only employee held over from the previous administration.

6. Second, she stated she asked for the position previously held by Hilma Smith before she was promoted. Since Ms. Smith is black, Ms. Stegall's allegation that she did not receive this position because of her race is simply not credible.

7. She was discharged effective June 19, 1983 because of her lack of secretarial skills. (DX 151—Letter of Termination dated 6-16-82). She disputes this and maintains that she was actually discharged in retaliation for her having filed an EEOC charge on April 12, 1982. (DX 152).

8. The evidence demonstrates that her superiors expressed concern to her about her skills long before she filed her EEOC charge. She admitted meeting with Charlene Schreder, white female, on December 22, 1981 in which meeting she was informed she must take a typing course to improve her skills. (DX 151—Notes). Although she agreed to do so, she failed to take such a course.

9. On March 30, 1982, after learning of her failure to improve her skills, Judge Dishongh was prepared to terminate her but, upon advice of the City's Personnel Office, instead gave her 90 days to enroll in a suitable typing course for which the City would pay. She informed her superiors that she had enrolled in a course at Arkansas Baptist College but did not inform them when the course was cancelled and instead, without permission, hired a private tutor. She was terminated when they became aware that she had given tuition assistance funds to a party other than the one approved in her tuition request (DX 151—Tuition Aid Application) and that she could not comply with the requirement to improve her skills in the specified time. (DX 153). She appealed her termination and it was upheld. (PX 72—Letter from Mahlon Martin dated 7-1-82).

10. Ms. Stegall maintains that she did not lack necessary skills and her discharge was not justifiable on that basis. There is substantial evidence to the contrary. Her CETA Employability Development Plan completed when she first interviewed with CETA in October, 1979 notes that she needed skill training. (PX 72). Her application forms show a decrease in skill—from being able to type 65 wpm and take dictation at 55 wpm in 1979 to 55 wpm and "some" dictation by February, 1981. Furthermore,

a review of these applications shows numerous misspellings of basic words.

11. Ms. Stegall alleged she was never warned about her lack of skill until the letter of March 30, 1982. But when confronted during cross-examination with the notes of her meeting with Charlene Schreder on December 22, 1981, she admitted that the meeting had occurred and acknowledged that the notes indicating her skills were inadequate and requiring her to take further training were accurate and her own application indicates serious problems in this respect.

12. I find that her discharge by Judge Dishongh was not racially motivated since she was the only member of Judge Holt's staff retained by him and since he promoted her to a permanent position with an increase in grade.

13. Her replacement, Rosalyn Smith, was also black.

14. She alleges she was the victim of racial harassment but she never complained, filed a grievance or filed an EEOC charge until it was obvious that her discharge was imminent.

15. She was given a full hearing on her discharge in which all these issues could be raised and it was upheld by the City Manager, Mahlon Martin, who is black.

16. Ms. Stegall also took copies of the expunged records of former probationers for her personal use and without the permission of the court. This is a clearly illegal act under the provisions of Ark.Stat. § 43–1235 and demonstrates a total disregard for the admittedly confidential nature of the records to which she had access.

17. I find that she has utterly failed to prove that her discharge was racially motivated.

## IV.

### CONCLUSIONS OF LAW

■ The trial court has the power to decertify this subclass. Rule 23(c)(1) Fed. R.Civ.P. *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 832 fn. 6 (8th Cir.1977). Class determination and maintenance are within the court's discretion. 3B Moore's Federal Practice § 23–422 (1982); *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir. 1975). "It is well settled further that even after certification, the district court has a duty to continually scrutinize adequacy of representation and withdraw certification if sufficient representation is not furnished. *See Grace v. Rumstrell,* 614 F.2d 796, 808–11 (1st Cir.1980)." *Sessum v. Houston Community College,* 94 F.R.D. 316, 322 (1982). *See also Lamphere v. Brown University,* 553 F.2d 714 (1st Cir.1977). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Ezell v. Mobile Housing Board,* 709 F.2d 1376 (11 Cir.1983).

■ . In a recent case the Supreme Court emphasized the requirements of typicality and adequacy in Title VII litigation brought under the aegis of Rule 23: "[W]e reiterate today that a Title VII class action, like any other class action, may only be established if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982).

In *Vuyanich v. Republic National Bank,* 505 F.Supp. 224 (N.D.Tex.1980) the court pointed out that the duty to constantly reevaluate class status does not end with the commencement of the trial, but that the focus of the court remain on the factors protecting the parties named and unnamed:

> Principal among these is adequacy of representation, and the court must not hesitate to decertify a class in whole or in part if the plaintiff has failed to present at least minimal evidence, or has otherwise demonstrated that her representation of all or part of the class is less than adequate.

*Id.* at 240.

The Fifth Circuit has noted that the court's responsibilities do not end with certification of the class but "it must continue

to carefully scrutinize the adequacy of representation and withdraw certification if such representation is not furnished." *Grigsby v. North Miss. Medical Center,* 586 F.2d 457, 462 (5th Cir.1978).

Relying on *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir.1973), the court in *Johnson v. Shreveport Garment Co.,* 422 F.Supp. 526 (W.D.La.1976) *aff'd* 577 F.2d 1132 (5th Cir.1978) made the following points which are particularly persuasive with respect to my ruling as to decertification of the discharge subclass:

(1) Class action status must be extant at two stages prior to trial and after presentation of the evidence;

(2) Rule 23 imposes on the court a continuous duty to protect the absent parties, insuring that they are not casting judgment without vigorous representation of their interests;

(3) The court as trustee for the absent parties must evaluate the class representatives' conduct of the entire litigation; and

(4) A judgment purporting to bind absent parties whose interests have been represented with dubious effectiveness acquires a particularly suspect character.

The class in this case should never have been certified, even though it was based on a stipulation by the parties. In the future I will more carefully examine each motion for class certification even though a stipulation is presented. Certification of a class presents the danger of "potential unfairness to the class members bound by the judgment...." *General Telephone Co. v. Falcon, supra,* 457 U.S. at 161, 102 S.Ct. at 2372–73. "Due process requires that the interests of absent class members be adequately represented in the class suit so that judgment could be *res judicata* as to them." *Grigsby v. North Mississippi Medical Center, Inc.,* 586 F.2d 457, at 461.

Judgment will be entered decertifying the discharge subclass and on behalf of the City of Little Rock with regard to the claims of the intervenor Belinda Mitchell.