Robert HERVEY, Jr. and Robert Walker, Plaintiffs,

v.

CITY OF LITTLE ROCK, Defendant,

Leo Anderson and Jesse MacHenry Johnson, Jr., Intervenors.

Mollie WHITE, Plaintiff,

v.

CITY OF LITTLE ROCK, ARKANSAS; Donald Mehlburger, Charles Bussey, Myra Jones, A.M. Sandy Keith, Lottie Shackleford, John Langston and Webster Hubbell, Individually and in their Official Capacity as Members of the Board of Directors of the City of Little Rock, Arkansas, Defendants.

Estella ROBINSON, Plaintiff,

v.

CITY OF LITTLE ROCK, Defendant.

Nos. LR–C–80–44, LR–C–79–235 and LR–C–80–311.

United States District Court, E.D. Arkansas, W.D.

Dec. 31, 1984.

Janet Pulliam, Nelwyn Davis, Little Rock, Ark., for Hervey and Walker and Leo Anderson and Jesse M. Johnson, intervenors.

Richard Quiggle, Little Rock, Ark., for Mollie White and Estella Robinson.

Philip K. Lyon, Stephen Jones, Ed Adcock, R. Jack Magruder, City Atty., Carolyn Witherspoon, Asst. City Atty., Little Rock, Ark., for defendants.

### MEMORANDUM OPINION

HENRY WOODS, District Judge.

#### I.

#### PRELIMINARY STATEMENT

Much of the prior history of this litigation is set forth in *Hervey v. City of Little Rock*, 101 F.R.D. 45 (E.D.Ark.1984) wherein I decertified the discharge subclass No. (2). There now remain for disposition subclasses No. (1) and (3) in the class stipulation entered into by the parties on October 26, 1981, as well as the individual claims of Robert Hervey, Robert Walker, Leo Anderson, Jesse MacHenry Johnson, Estella Robinson, and Mollie White. The parts of the stipulation pertinent to this phase of the litigation read as follows:

1. All nonuniformed, nonmanagement, nonsupervisory black persons employed by the defendant who have allegedly been discriminated against because of their race in promotions or transfers since January 24, 1977 for purposes of 42 U.S.C. § 1981 and since 180 days prior to May 28, 1981 for purposes of 42 U.S.C. § 2000e.

....

3. All nonuniformed, nonmanagement, nonsupervisory black persons employed by the defendant who have allegedly been discriminated against in the terms, conditions and privileges of their employment because of their race, for purposes of injunctive relief only, since January 24, 1977 for purposes of 42 U.S.C. § 1981 and since 180 days prior to April 2, 1979 for purposes of 42 U.S.C. § 2000e.

The class representatives were stipulated as follows:

Fourth, plaintiffs Hervey and Robinson are the proper class representatives for the subclass 1 above. .... All of the plaintiffs are proper class representatives for subclass 3 above.

Fifth, each of the plaintiffs will continue to prosecute and try their individual claims of racial discrimination, and the plaintiffs Mollie White and Estella Robinson will also continue to prosecute and try their individual claims of sexual discrimination.

It was agreed that the matter would first be tried on liability and later on damages and remedies.

The conflict among counsel, which has plagued this litigation from the outset (*see* 101 F.R.D. at 48), has continued apace. On

April 25, 1984 I designated Ms. Janet Pulliam as the lead counsel for subclasses (1) and (3). Ms. Pulliam is a competent and experienced lawyer who, along with Judge Perlesta Hollingsworth, had filed the original class action suit for Robert Hervey and Robert Walker. Along with Judge Hollingsworth, she also represented two of the other three individuals (Leo Anderson and Jesse M. Johnson) involved in the remaining aspects of the class case. On March 27, 1984 the Court set this matter for trial on July 16, 1984. On July 12, 1984 Mr. Richard Quiggle who, along with Mr. John Walker, had been representing Estella Robinson and the individual plaintiff, Mollie White, filed a motion to withdraw as counsel. In the motion he stated:

1. The undersigned entered this case in early 1980 after becoming associated with Mr. John Walker by virtue of an employment contract. This contract controlled the nature and extent of my involvement in this and several other cases.

2. I do not now, nor have I ever, directly represented any of Mr. Walker's clients—Ms. Mollie White or Ms. Estella Robinson—in this matter or any other

. . . . .

3. My contractual relationship with Mr. Walker has now terminated. Thus, there is no basis for my continuing involvement in this matter as an attorney of record for the purpose of the rescheduled trial.

When the case was called on July 16, 1984, Mr. Quiggle appeared and requested that I hold his motion in abeyance (T. 2233). This portion of the trial was concluded on July 18, 1984. During this time, the following witnesses testified: Plaintiff Robert Walker, plaintiff Robert Hervey, intervenor Leo Anderson, and intervenor Jesse MacHenry Johnson, as well as anecdotal witnesses Louis Porch, Harold Blackwell, James Nathaniel, Saleem Madyun, and Charlie Gordon. Plaintiffs also called Ronald Lloyd, Former Director of Personnel for the City. The principal witness was Dr. Martin Shapiro, plaintiffs' expert witness. On July 18, 1984 plaintiffs completed their class action proof and rested that phase of

their case. I advised the parties that I would give the plaintiffs an opportunity to bolster their *prima facie* case by presenting testimony in the individual cases of Robert Hervey, Robert Walker, Jesse Johnson, Mollie White, Estella Robinson, and Leo Anderson. *Craik v. Minnesota State University Board*, 731 F.2d 465 (8th Cir. 1984). I further advised the parties that at the close of this testimony I would decide first, whether, in view of the stipulation as to subclasses, a viable class representative remains for subclass one, and second, whether plaintiff had made a *prima facie* case on the two remaining subclasses (letter to counsel, November 2, 1984). The cases of Hervey, Anderson, Walker, and Johnson were reset for November 26, 1984, and the individual cases of Estella Robinson and Mollie White were set for November 27, 1984 (letter to counsel dated November 2, 1984). On November 15, 1984 I received the following letter from Mr. Richard Quiggle:

Mr. Walker, or someone from his office, will be handling the testimony of Ms. Estella Robinson and Ms. Mollie White when the trial in this case reconvenes. Accordingly, it seems to me that my presence would be surplus, and not required. Therefore, I do not intend to attend the remaining portions of the trial, unless, of course, the Court determines that my presence is required.

(Court's Ex. 1.) A copy of this letter went to all counsel, including Mr. John Walker. Before the trial began on November 26, I received a second letter from Mr. Quiggle dated November 26, 1984 referring to a letter of Mr. Walker dated November 23, 1984. Other counsel and the Court had not received Mr. Walker's letter of November 23 (T. 2798) at the beginning of Court on November 26, but it was delivered to me in the middle of the afternoon on November 26 (T. 2900). In this letter Mr. Walker stated:

Please be advised that Mr. Richard Quiggle is still the attorney responsible for presenting the cases of Ms. Mollie White and Ms. Estelle Robinson. He has indicated that I or someone from my office

will be making those presentations. That is not correct. Mr. Quiggle has prepared the individual cases of both persons, has their personal files and the notes of his paralegals and their support witnesses, and has led plaintiffs to believe that he will be making the presentations. I further state to the Court that the clients have an expectation based on his subsequent involvement with them and their payments of fees and costs to him that he will continue their representation.

Moreover, before last week, he represented to the Court that he was still their counsel. He has been lead counsel on their matters and all related matters as well. An eleventh hour withdrawal, sue sponte, as he proposes is inappropriate.

(Court's EX 3.) Mr. Quiggle's letter of November 26 reads as follows:

I write to correct several factual inaccuracies in Mr. Walker's letter to the Court of November 23, 1984, and to clarify my position in this case.

First, I have not prepared the individual cases of either Ms. White or Ms. Robinson. Mr. Walker has had their files since June when I first moved to withdraw from the case and turned over all of the files in the matter to him.

Second, I have in no way led these plaintiffs to believe that I would be representing them when the trial reconvenes. In fact, I had had no contact with either of them since December 1983, until mid-day Friday when they called wondering what was going on. I explained to them that Walker was claiming they were "his" clients, not mine, and accordingly it would be more appropriate for him to make the necessary arrangements for their testimony. Moreover, I never represented any clients in this case in their own right, but only represented them by virtue of my relationship with Walker. I remind the Court that Ms. White's case was filed several months before my relationship with Mr. Walker commenced in late January 1980.

Third, I did move to withdraw as counsel for plaintiffs and asked the Court to hold a ruling in abeyance, the Court took this a withdrawal of the motion and thus ruled it moot on August 21st. However, the filing of this motion was certainly notice to Walker that my role was to be limited, and in fact our agreement was I would stay in the case in order to pursue the pending appeal of the Court's decertification/dismissal order. Moreover, on October 25th, I wrote Walker and told him I would not be responsible for the testimony of Ms. White or Ms. Robinson. In order to further clarify my role, I wrote the Court on November 15th, disavowing any responsibility for these clients. I heard nothing from the Court, and nothing from Walker until I received his November 23rd letter in the late afternoon. My unanswered November 15th letter certainly contradicts Walker's claim that "before last week, he represented to the Court that he was still their counsel." Incidentally, this letter was also sent to both Ms. White and Ms. Robinson, and I heard nothing from them either until mid-day November 23rd.

Next, Walker is flatly incorrect that these clients have ever paid me any fees. As the Court already knows they did make some modest advances toward costs.

Finally, I have no desire to detract or harm the cases of Ms. White or Ms. Robinson. They deserve vigorous representation. However, in light of the virtual cessation of my relationship with Walker—the source of my involvement in the first place—I do not think I should be the one to provide it. Walker should make arrangements for the representation of his clients. I renew my motion to withdraw.

(Court's Ex 2.)

Because Mr. Walker had signed the White complaint alone and co-signed the Robinson complaint and on the basis of Quiggle's two letters, which were all I had in hand when the trial began on November 26, 1984, I granted his motion to withdraw which had been held in abeyance (T. 2799). Late in the afternoon of November 26, I received a hand-delivered motion from Mr. Walker to reconsider my ruling on the

withdrawal of Mr. Quiggle (Court Ex 4). This motion incorporated statements from Ms. White and Ms. Robinson described as being under oath but without a *jurat*. In these statements each asked that "Mr. Richard Quiggle be reinstated to represent her cause herein."

After I received this motion, I directed the Clerk to have Mr. Walker and Mr. Quiggle in court the following morning, along with Ms. White and Ms. Robinson. I put the latter under oath and asked them which lawyer they desired to represent them in this matter. Both responded that they desired Mr. Quiggle to represent them. I then advised Mr. Quiggle that it was his responsibility to represent these women. (T. 2905.) After hearing a short witness to accommodate all parties, I adjourned the case until 1:30 p.m. to give Mr. Quiggle an opportunity to confer further with his clients.

## II.

### FINDINGS OF FACT

#### A. *The Class Action*

1. The principal theory advanced by Dr. Shapiro is that the City's promotion procedure had an adverse impact on blacks. This theory is cognizable only with respect to Title VII cases, 42 U.S.C. 2000e et seq. Under the stipulation this would mean that Title VII violations are restricted to a period after November 28, 1980.

2. At the threshold we are met with the fact that neither of the stipulated class representatives for subclass (1) are asserting a Title VII claim which falls within the relevant dates. Hervey testified that he had had no problem since he was reclassified on September 15, 1980. Hervey was not complaining about testing procedures. The other designated class representative was Estella Robinson. Her complaints are also outside the stipulated time frame. Thus there are no viable class representatives for the major theory advanced in this case. While these two individuals can serve as class representatives for the § 1981 alleged violations occurring since January 24, 1977 in the promotion subclass, there is no credible evidence that the City intentionally discriminated against either of them on the basis of race during this time period.

3. Dr. Shapiro attempted to demonstrate the impact of the totality of promotion techniques on blacks and also the fact that competitive exams play a larger role for blacks than whites (T. 2527). Dr. Shapiro found such an impact by taking the totality of advancements during the years 1977–1982. "Advancements" in his statistics were defined as competitive promotions, reclassifications, and career ladder upgrades. In the above time frame (1977–1982), he found that 308 white and 266 blacks had secured advancements. Since he found 51–54% of the work force to be black, there were more than two standard deviations from which he inferred discrimination against blacks. There are several fatal flaws in Dr. Shapiro's statistical conclusions. First, his inquiry was not restricted to the relevant time frame; second, he did not consider the highly relevant variables of education and tenure; third, he included reclassification, which is a different term entirely from promotion ("reclassification" was not included in the stipulated class; it was restricted to "promotion and transfers," which are not reclassifications (T. 3027, 3112, 3113, 3137, 3200)); fourth, he aggregated the results from different tests for many diverse jobs; fifth, he did not remove supervisory jobs from his analysis (T. 2533); sixth, he did not determine the makeup of the relevant pool from which each advancement was made (T. 2535–57); and seventh, he did not separate the part-time from full-time employees or account for temporary employees (T. 2573–78).

4. It can hardly be claimed that the competitive examinations militate against blacks because Dr. Shapiro himself found that in a work force 53–54% black, blacks received 122 competitive promotions and whites received 115 (T. 2477).

5. Blacks also fare better in the career ladder upgrades, according to Dr. Shapiro; 39 of these were obtained by blacks and 32 by whites (T. 2479). This is certainly a

strong indicator that the City was making a serious and effective attempt to treat blacks fairly in the matter of promotions.

6. With respect to reclassifications, if these are restricted to the time frame after November 28, 1980 per the stipulation, there is no adverse impact on blacks (T. 258). Mr. Martin, the black City Manager, testified that he never saw anything to indicate that race or sex played any part in the City's classification decisions (T. 3203). Whatever impact occurred was in the year 1979 when a policy of reclassifying a number of positions, principally in the clerical category, was instituted (T. 2554, 3113, 3176). Dr. Shapiro stated that this reclassification policy impacted on blacks, but the Court finds it is outside the stipulated Title VII time frame. I find that the City's classification and reclassification system is fairly designed and administered (T. 3106, 3115, 3158–61).

7. With respect to the content and validation of testing procedures, I find no evidence that such testing procedures were designed to discriminate against blacks (T. 3020, 24, 3028–30). I find no discrimination in the referral or interview procedures (DX 237 and 238; T. 3069–71).

8. It is highly significant that Dr. Shapiro testified that under his own definition of "promotions" using competitive promotions, reclassifications, and career ladder upgrades, there was no disparate impact in December 1980, 1981 and 1982 (the stipulated time frame). The following testimony is highly significant: "That is, looking at this aspect of what we've been talking about, that is, the total number of movements, looking at '81, '82, there is not a disparity. If you add December and something in November, I doubt you'd have a disparity because if you look at all of '80 the disparity is not huge, so if you took one month of it, it's not going to really affect things." (T. 2588.)

9. Dr. Shapiro proffered testimony on the terms and conditions of employment (subclass (3)) when the last phase of the case began on November 26, 1984. The Court sustained an objection to this testimony because plaintiffs had previously rested (T. 2800–11). Dr. Shapiro testified that there was a significant variance in salaries of blacks and whites in the year 1980 (T. 2878–84). However, since only injunctive and not mandatory relief was asked for subclass (3), and since there is no evidence whatsoever in this record that there is presently a salary variance between blacks and whites, the testimony, even if admitted, would not be significant.

10. During most of the relevant time frame, blacks occupied the highest echelons of Little Rock City government. Mahlon Martin was City Manager; Nathaniel Hill was Director of Human Services (whose department was subject to many of the complaints); and Temperlene Horne Grissom was Chief of Employment and was in charge of testing and recruitment (T. 1288–94, 3007).

11. The individual consolidated cases do not bolster plaintiffs' class action case; neither do the anecdotal witnesses. Robert Hervey and Estella Robinson are the designated class representatives for the promotion class. The Title VII complaint of neither is within the stipulated time frame. Hervey's complaints are that he did not receive a promotion to vehicle mechanic prior to September 15, 1980. On the latter date he did receive the promotion and testified that he had no problems or complaints since that time. Estella Robinson complained about not receiving a promotion in July, 1978. This is far outside of the stipulated time frame for Title VII. Moreover, Mrs. Robinson's complaint is based on sex discrimination, while the stipulation only covers race discrimination. The promotion about which she complained went to a black male.

12. Reliable statistics indicate that blacks are overrepresented in every category of non-supervisory city employment (the stipulation covers only non-supervisory employment). While not conclusive, this would strongly indicate that blacks are not the subject of discrimination by the City either in promotion or in the terms and conditions of employment. The work force representation of blacks in non-supervisory employment with the City is shown in the following statistics (DX 260–F and 260–H):

WORKFORCE REPRESENTATION OF
BLACKS
NON–SUPERVISORY POSITIONS
(JUNE 1982)

| | Total | Black | Pct/Blk |
|---|---|---|---|
| Officials & Admin. | – | – | – |
| Professionals | 51 | 14 | 27.5% |
| Technicians | 50 | 10 | 20.0% |
| Protective Service | 54 | 38 | 70.4% |
| Para Professionals | 74 | 45 | 60.8% |
| Office—Clerical | 114 | 45 | 39.5% |
| Skilled Craft | 133 | 28 | 21.1% |
| Service Maint. | 359 | 274 | 76.3% |
| Total | 835 | 454 | 54.4% |

Note: Data is based on Updated Responses to Interrogatory No. 1; data includes persons who occupied job positions which were non-management, non-supervisory, and non-uniformed positions. The definition used for "supervisory positions" is provided in the Updated Response to Interrogatory No. 6A–1 as provided in DEFENDANTS' UPDATED RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANT.

Even if supervisory employees are included, the work force representation of blacks exceeds the expected representation in every category. This is demonstrated by Exhibit 260–H (RLM represents the Relevant Labor Market):

ANALYSIS OF WORKFORCE REPRESENTATION OF BLACKS
(June 1982)

| EEO–4 CATEGORY | RLM% BLACK | WORKFORCE TOTAL | EXP. BLACK | ACT. BLACK | NO. STD. DEVIATIONS |
|---|---|---|---|---|---|
| Officials & Admin. | 6.2 | 42 | 2.6 | 5 | +1.5 |
| Professionals | 8.3 | 96 | 8.0 | 27 | +7.0* |
| Technicians | 8.4 | 58 | 4.9 | 10 | +2.4* |
| Protective Services | 28.6 | 54 | 15.4 | 38 | +6.8* |
| Para Professionals | 17.3 | 83 | 14.4 | 48 | +9.8* |
| Office—Clerical | 17.3 | 117 | 20.2 | 45 | +6.1* |
| Skilled Craft | 17.5 | 158 | 27.7 | 36 | +1.7 |
| Service Maint. | 39.6 | 360 | 142.6 | 274 | +14.2* |

Source: Workforce data is based on exhibit entitled WORKFORCE REPRESENTATION OF BLACKS NON-SUPERVISORY POSITIONS JUNE 1982 and WORKFORCE REPRESENTATION OF BLACKS SUPERVISORY POSITIONS. Data for the relevant labor market is derived from the Special EEO–1 Census Tape File. This file contains data for the civilian labor force of age 16 and over for Pulaski County. The data in the last column reports the number of standard deviation units between actual and expected numbers of blacks in the workforce. An asterisk indicates that the difference is statistically significant.

13. The City maintained an aggressive and effective affirmative action program during the relevant time frame under the observation of Mr. Mahlon Martin, a black, who was City Manager of Little Rock from July, 1980 to January, 1983 and prior thereto was the Assistant City Manager from the middle of 1977. He testified that "as assistant city manager I was responsible for the day-to-day operation of city government." (T. 3154.) Thus, during practically all of the relevant time frame, the City's chief executive officer was a black. I was impressed by Martin's grasp of city government, obvious administrative ability, and fairness. He was involved in a program known as the New Careers Program, which he described as "aimed at attempting to place disadvantaged individuals into paraprofessional jobs or positions with the City and hopefully provide career upward mobility for these individuals" (DX 42 A–D; T. 3155). Mr. Martin testified that he was involved in recruiting minorities (T. 3156) and "attempting to train persons in ways that would remove any discrimination or adverse impact" (T. 3157). Mr. Martin stated that during his tenure with the City all three city managers and the Board were committed to affirmative action (T. 3157). He testified that through the Training and Orientation Program there were major efforts "in regard to what one should or should not do in line with discrimination" (T. 3158). An affirmative action officer was employed to continue these efforts (T.

3158). He described the affirmative actions of the City as successful (T. 3158).

14. In order to recover for disparate treatment under Title VII with regard to promotions, plaintiffs would have to show that treatment was intentional and that it occurred after November 28, 1980. In order to recover under 42 U.S.C. §§ 1981 and 1983, the plaintiff would likewise have to establish intentional discrimination since January 24, 1977. I find that plaintiffs have failed to establish such intentional discrimination during these relevant time periods on the basis of statistical testimony, the anecdotal testimony, or the testimony on behalf of the individual plaintiffs or intervenors whose cases were consolidated with the class action.

15. The proof on behalf of individual plaintiffs and intervenors is discussed, *infra*. Myra Butler and Ethel Stegall, whose principal complaints were that they were discharged, also complained of failure to receive promotions. Their claims are fully discussed in *Hervey v. City of Little Rock*, 101 F.R.D. 45 (E.D.Ark.1984).

16. The anecdotal witnesses do not significantly bolster plaintiff's class claims under subclasses (1) and (3). Mr. Danny Johnson offered no evidence of class-wide discrimination during the relevant time frame. He resigned March 22, 1977. Neither did Gladys Hayes, who received the promotion she sought in the supervisory category that was not covered by the stipulation (DX 128 and 129; T. 1376–77). Ms. Sandra Donaldson was first hired by the City in May, 1979 as a Collections Clerk, grade 4 with a monthly salary of $605.00 (T. 500). On December 14, 1981 Ms. Donaldson was upgraded to the position of Office Assistant II, grade 5, with a commensurate increase in salary to $887.00 per month (T. 530). In slightly over four years of employment with the City, Ms. Donaldson has received one major upgrade and her salary has almost doubled (T. 531). On cross-examination it was also established that the City had paid her tuition for a number of college courses at the University of Arkansas at Little Rock (DX 73) and has allowed her flexible working hours to facilitate her school schedule (DX 74). (T.

532–33). She has never filed a charge of discrimination with the EEOC (T. 535). Theodore Holmes received the one promotion he applied for before he resigned (DX 106; T. 1045–46). Virgilene Hampton requested an audit of her position, and it was reclassified as a result (DX 125; T. 1359–61). Charles Gordon testified that he had worked for the City from 1956–1981 as a laborer and had never been promoted (T. 2420). On cross-examination he admitted he had never sought promotion (T. 2422). Willie Eakles, Sr. testified on direct examination that he had been denied promotional opportunities because of his race (T. 2423). On cross-examination he first denied any disciplinary warnings or being laid off for something he had done (T. 2425). It was developed on cross-examination that he had been subject to several disciplinaries: going fishing when he was supposed to be on sick leave (T. 2425–27); being at fault in an accident with a city vehicle (T. 2429); damaging a city gas pump (T. 2432); running out of gas in a city vehicle and tying up the mechanic for two and one-half hours (T. 2433); failing to wear safety helmet after being warned (T. 2435); operating a tractor in a careless manner causing an accident (T. 2436); failing to report an automobile accident (T. 2437); and disobeying orders (T. 2430). In view of this man's record with the City, it is obvious why he has not received promotional opportunities. Louis Porch complained about not being promoted from Equipment Operator III to Heavy Equipment Operator V in 1982, 1983, and 1984. However, on cross-examination it was developed that Porch had received a written reprimand on July 16, 1982 for causing severe damage to city equipment by not obeying orders (T. 2753). It was also developed that prior to his employment by the City, Porch had been convicted of armed robbery (T. 2756). Harold Blackwell testified that he was not promoted from Operator III to Operator V because his supervisor had discouraged him from applying for the job (T. 2760). No proof was introduced that he was qualified to be an Operator V. Blackwell had had a number of disciplinaries, two of which were for

disobeying direct orders (DX 209 and 210), and one for damaging a city vehicle by careless operation (T. 2765). James Nathaniel, an Operator III, had also failed to receive a promotion to Operator V. He testified that he had tested three times for this position, but there is no proof as to the results of these tests or the extent of his qualifications for the job sought. Nathaniel went to work originally as a part-time employee and was made a full-time employee on March 25, 1982. (T. 2776.) Saleem Madyum claims denial of promotional opportunities (T. 2780). He testified that he applied for Operator IV in April or May of 1979 and did not receive the promotion. This is outside the stipulated time frame for Title VII in subclass (1), but on cross-examination Madyum admitted that he did receive the position he sought (DX 213 and 214; T. 2784–85). I find that there was no disparate treatment under Title VII and no intentional discrimination under 42 U.S.C. § 1981 as far as any of these anecdotal witnesses are concerned. Nor do I find any discrimination with regard to terms or conditions of employment under either of these statutes which would justify injunctive relief.

### B. The Claim of Leo Anderson (Intervenor in LR–C–80–44)

1. Leo Anderson intervened in this case after the stipulated order was signed. He is a Senior Parks Worker II at the War Memorial Golf Course and has been at this location for three years (T. 2371–72).

2. He was hired on March 26, 1972 as a laborer and immediately went to work at the Hindman Golf Course. He was supposed to be on probation for six months, but this was shortened to three months, after which he received a permanent position and increase in pay (T. 2380). The classification was Park Maintenance I, P–5. He remained in this classification until 1980.

3. On April 7, 1980 Anderson applied for and received the position of Park Maintenance II, P–6 with an increase in pay of $60.00 per month. Steve Smith, his supervisor, helped him secure this increase in grade. (T. 3225–27.)

4. Powell Tidwell, his foreman, was fired in September of 1981, and he was made acting foreman for three months at Hindman Golf Course. This appointment was made by Steve Smith (T. 3227).

5. Anderson did not apply for the job of permanent foreman, which went to Mark Harness, a Maintenance II worker at War Memorial Park. When Harness was made foreman at Hindman, Anderson was transferred to War Memorial Park to take the position vacated by Harness. (T. 2390.) This transfer resulted from business necessity on the part of the City and was not related to racial bias.

6. After he had been at War Memorial for two months, he applied for a transfer back to Hindman (T. 2394). This request has not been granted although the matter has been taken up by the Union (T. 2394). It was not followed up by the Union (T. 2856). The City had legitimate reasons for keeping him at War Memorial (T. 3237).

7. Anderson first claimed that the reason he did not apply for the foreman's job was that Steve Smith, his supervisor, discouraged him from doing so (T. 2388). He claimed that Smith constantly harassed him on the job (T. 2389, 2396–2402). However, in his deposition taken on June 15, 1982, p. 53, Anderson denied that Steve Smith had criticized him (T. 2410). After this statement was called to his attention, Anderson testified at the hearing before me: "He didn't criticize my work, or nothing like that. He just harassed me about getting the supervisor's position to fill that position." (T. 2411). He did not say in his deposition that the reason he did not take the test was because Smith was harassing him (T. 2411). Later in his testimony he said he did not apply because he did not know when the test would be given (T. 2412). He testified in the trial that he had called the personnel office about the test (T. 2413). However, in his deposition he denied calling personnel about the test (T. 2414).

8. Mr. Anderson claimed that the job vacancy at Hindman was not posted. I find the overwhelming testimony is that

the job vacancy was posted. (T. 3230, 3309, 3306.) I further find that Mr. Anderson was aware of the test and the upcoming vacancy and that he did not apply because he did not want the additional headaches and responsibilities that went with the job (T. 3229, 3231–32, 3306, 3309, 3319, 3325).

9. Mr. Anderson's assignment to the War Memorial Park as a Maintenance Worker II was based on business necessity and was in no sense motivated by intent to discriminate against Mr. Anderson (T. 3237). The reasons advanced by the City for transferring Anderson to the War Memorial Golf Course and keeping him there are legitimate, nondiscriminatory reasons (T. 3237).

10. During the time that Anderson worked as the acting foreman at Hindman Golf Course, he was paid in accordance with the City's Rules and Regulations (DX 245).

11. Anderson was not subjected to harassment on his job by his superior (T. 3238, 3239, 3308, 3325) and was not subjected to racial discrimination, intentional or otherwise.

### C. The Individual Complaint of Robert Hervey (LR–C–80–44)

1. Hervey was hired as a park mechanic in February of 1973. When he came to work, he stated, "I don't have the background to be a Mechanic; I know how to weld." (T. 2368.)

2. In a year he was promoted from P–7 to P–8 and received a salary increase (T. 2305).

3. On March 29, 1976 he was promoted from Park Mechanic to Assistant Vehicle Mechanic (T. 2347). The job description for this position included the following:

> Promotes minor tune-ups, assists in removing major parts of gasoline engines, and drive trains, assists in breaking down motors, realigns brakes, cleans carburetors, replaces shocks, king pins and tie rods, replaces clutches, installs U-joints and drive shafts, assists in other things.

(T. 2333.) This was the work that he was performing (T. 2333) until his promotion to Vehicle Mechanic.

4. On September 15, 1980 Hervey was promoted to Vehicle Mechanic (DX 249; T. 3374). He has had no problem since that time (T. 3376). His complaints were all prior to this time. His EEOC complaint was filed September 1, 1979. The relevant time frame for liability under Title VII begins March 8, 1979 in his individual claim.

5. Hervey's EEOC complaint was based on a denial of promotion to Vehicle Mechanic on April 2, 1979. The EEOC rendered a no-reasonable-cause determination (DX 248).

6. The Court finds that the overwhelming proof in this case is that Hervey was not qualified as a vehicle mechanic when he was denied promotion to that position on April 2, 1979 (T. 3370–73, 3430–32, 3442). By his own admission, Hervey had no prior training or experience as a mechanic before he was hired by the City (T. 2365). Prior to April, 1979 Hervey had been performing simple mechanical tasks falling within his classification as Assistant Vehicle Mechanic (DX 169; T. 3459). A vehicle mechanic must do the following: overhaul motors and transmissions; work on diesels, air conditioners, and air brakes; and make other major repairs (T. 3366–68).

7. The Court further finds that the individual Bewley, who was promoted to Vehicle Mechanic in 1979, was exceptionally qualified to hold this position. He had 20 years of experience as a vehicle mechanic and for 16 years had served as the foreman of the garage operated by one of the largest dairies in central Arkansas.

8. Assuming that Hervey was minimally qualified, which I specifically find to the contrary, the City was completely justified in choosing Bewley for the position of Vehicle Mechanic in place of Hervey, and the choice of Bewley was based upon legitimate, nondiscriminatory reasons which were not pretextual.

9. The Court finds an absence of testimony that the City intentionally discrimi-

nated against Hervey. Mr. Hervey's original assignment was to the Parks Garage at Boyle Park where he was under the supervision of Mr. Robert Alexander. He did not get along with Alexander, and his work performance and attendance were roundly criticized. (T. 3406.) He was moved to the central garage in 1977, after being made an Assistant Vehicle Mechanic, a position which gave him the opportunity to learn the work of a vehicle mechanic (T. 3365). He was promoted to Vehicle Mechanic in September of 1980. In spite of his extremely limited background as a vehicle mechanic when hired by the City, he has been given every opportunity to learn this skill, along with concomitant promotions and salary increases. This proof negates any contention that the City has intentionally discriminated against him.

10. Hervey has no complaint about the City's testing procedures (T. 2348).

11. The individual claim of Robert Hervey should be denied and dismissed, inasmuch as there is no credible evidence that he has been discriminated against.

### D. Individual Claim of Robert Walker (LR–C–80–44)

1. Robert Walker's claim of discrimination is based on his treatment by the City after he injured his back and became disabled on December 4, 1978 (DX 250; T. 3376).

2. Mr. Walker was on sick leave until May 7, 1979 (T. 3378). During that time he was receiving Workers' Compensation benefits, which were supplemented by the City up to the equivalent of his salary (T. 3381–82).

3. On May 7, 1979 he attempted to return to work with a doctor's statement that he do no "heavy lifting" (T. 3378). His supervisor sent him home until this terminology could be clarified (DX 251; T. 3380). On May 10, 1979 Walker's doctor advised that he "was not certain of this man's amount of motivation to return to work" (DX 251; T. 3381). "Heavy lifting meant anything over 40–50 pounds." (DX 251; T. 3380.) I find that the work of a vehicle mechanic could not be performed with this restriction.

4. Walker drew Workers' Compensation supplemented by his salary until September, 1979, when he was terminated (DX 196 and 252; T. 3381–82). Upon termination Walker was eligible for permanent disability. He appealed his termination (DX 254; T. 3383, 3385), and the Civil Service Commission ordered that he be given a 45-day trial period (DX 254). During this period he performed satisfactorily (PX 133).

5. On March 21, 1980, the day following his trial period, Mr. Walker left work complaining of back pain (DX 255; T. 3386). By letter dated March 25, 1980 Mr. Walker's physician indicated that during the trial period his back problem had been exacerbated.

6. On April 2, 1980 Walker's physician advised that Walker could return to "light duty" providing he did "no heavy lifting, bending, or stooping" (DX 256). In accordance with the testimony, I find that the position of Vehicle Mechanic could not be performed with this restriction.

7. In order to provide a position that Walker could perform with his physical limitation, the City created the position of Service and Maintenance Attendant (DX 198; T. 3388). This job entailed pumping gas, changing oil, and doing minor tuneups (DX 197 and 198). Mr. Walker originally accepted this job which entailed a cut in pay (T. 3389, 3348). After a short time, however, he quit this job and was terminated (T. 3389–90). He appealed to the Civil Service Commission, which upheld his termination (PX 135; T. 3390).

8. After his termination, Walker applied for and received permanent disability status (T. 3391). I find that Walker is permanently disabled. The City has no job involving light duty which Mr. Walker is willing to perform. I further find that he is physically incapable of performing his former job as a vehicle mechanic (T. 3434). The City has never afforded anyone, white or black, permanent light-duty status (T. 3391–93; 3434). Various individuals have been given temporary light duty status

while they are recovering from an injury (T. 3392–93). Walker is claiming discrimination in that he was not permitted to return to his former position, the duties of which he cannot perform because of a permanent disability. Walker has been unable to prove that any white or any other black has been afforded such a prerogative (T. 3434). He has not contradicted the City's claim that it needed an individual in Walker's position who is able to perform the duties.

9. The Court finds no evidence whatsoever that Mr. Walker was the subject of racial discrimination on the part of the City. On the contrary, the City tried to work out an accommodation in view of his permanent injury.

### E. The Individual Claim of Estella Robinson (LR–C–80–311)

1. Ms. Estella Robinson was hired as a case worker in the Model Cities Program by Mr. Nathaniel Hill, a black, who is head of the Department of Human Services of the City of Little Rock. On July 9, 1973 she was transferred to the South End Family Service Center, which was a part of the Department of Human Services.

2. On October 28, 1974 she was reclassified and upgraded from a Social Service Aide II, grade P–5, to Social Service Aide, grade F–4, which resulted in a pay increase (DX 46).

3. On March 15, 1976 she was promoted to Social Service Worker, grade F–5, with another pay increase (DX 46).

4. Ms. Robinson applied for promotion to Youth Specialist EEO Officer on November 15, 1979 (DX 46). However, there is no evidence that her failure to receive this promotion was because of her race or sex. Actually, the position was given to a black female, Cheryl Martin (T. 3024).

5. Ms. Robinson filed an EEOC charge with respect to her employment on May 27, 1979. Liability for a Title VII violation would thus be restricted to acts occurring after November 27, 1978. Her complaint was filed on June 25, 1980 for race and sex discrimination under 42 U.S.C. §§ 1981, 1983 and 2000e. No action occurring before June 25, 1977 is thus actionable pursuant to §§ 1981 and 1983.

6. Ms. Robinson's principal complaint and virtually all her testimony and proof centered on sex discrimination in her failure to receive the position of Director in Charge of Dispensing Commodities at the South Little Rock Service Center in July of 1978. This complaint is outside the Title VII time frame. Since 42 U.S.C. § 1981 does not apply to sex discrimination, we are looking at 42 U.S.C. § 1983 in her case, and she must prove that the decision not to give her this position was traceable to a sexually discriminatory purpose.

7. The decision not to promote Ms. Robinson was made by Mr. Nathaniel Hill, head of the department (T. 3483). Mr. Hill selected Mr. Harlee Watson, a black male, for the job (T. 3481). Mr. Hill testified that Watson had a degree in purchasing and that he wanted to fit him into a job more in line with his training and ability (T. 3481). Mr. Watson was then in a Parks Department job requiring only manual labor, and Mr. Hill felt that placing him in the instant job would accord with the City's affirmative action policies (T. 3481–82). Mr. Hill also testified that the job required taking a truck to the North Little Rock warehouse, loading it, and then unloading it at the South Little Rock Center (T. 3482–83). He also testified that the job entailed lifting cartons of food weighing 35–50 pounds (T. 3482). Mr. Hill doubted that a female could physically handle the job (T. 33484). He also thought there were security considerations which made it more desirable to employ a male (T. 3490–91).

8. The former Director Lou Gary Hughes, who had been fired by Hill (T. 3501–02), testified on behalf of Ms. Robinson that CETA employees did the lifting (T. 3549). However, Hill testified in rebuttal that after Hughes left, Watson had to perform this task (T. 3569).

9. There is substantial independent evidence to support Mr. Hill's testimony. Mr. Hughes was employed as a Food Program Supervisor, grade F–6. (DX 261.) Subsequent to his discharge on April 13, 1978,

the position was reclassified and upgraded to South Little Rock Center Director, grade F–7. This change was the result of a job audit and recommendation of the Classification Section. (DX 262.) It is noteworthy that this change occurred during the period Mr. Mahlon Martin was approving all reclassification decisions. This reclassification decision resulted in a new job description and specification, both dated May 1, 1978, which reflected a change in the position's duties and responsibilities (DX 262.) It is particularly noteworthy that the new description and specification incorporate specific references to the need to "assist in the unloading of food supplies and the storage of such commodities" and securing food commodities on a weekly basis (which is consistent with Mr. Hill's testimony that this individual had to go to North Little Rock each week to pick up food supplies); accompanying the Custodian/Driver to the Food Storage Warehouse; helping to load and unload food upon delivery; and stacking food in the food storage area. (DX 262.) Plaintiff repeatedly argued that one would expect the job description to reflect any lifting duties, and, when the description and specification were introduced during surrebuttal, they reflected exactly that.

10. Mr. Hill testified that he had observed Ms. Robinson in her work environment and that she always avoided any lifting chores (T. 3484). I find that the weight-lifting requirement of the job was real and was not a pretext for selecting Watson over Ms. Robinson. I reject the proposition advanced by Ms. Robinson that Mr. Hill was guilty of purposeful sex discrimination in violation of 42 U.S.C. § 1983.

11. The Court further finds that outside of the weight-lifting problem, Mr. Watson's educational background was more in accord with the requirement of the particular job. His education was in purchasing; Ms. Robinson's was in social science.

12. Ms. Robinson also claims discrimination in the handling of her request that her F–5 position be upgraded. The record discloses that Mr. Hill requested the upgrade, but the Personnel Department objected on the ground that this would upset the equity of the classification system. In-stead she was given a double-step salary increase. This hardly shows purposeful discrimination on the part of the City. The reason for the denial of the upgrade is a legitimate, nondiscriminatory reason. Significantly, the upgrade audit was made by a black. (DX 61; T. 2957.)

13. In her letter of resignation to Mr. Nathaniel Hill dated June 30, 1981, Ms. Robinson said that it had been a pleasure working for him and that the experience had been "great and rewarding" (T. 2959).

14. Ms. Robinson obtained a master's degree while working for the City of Little Rock, six hours of which were paid by the City (T. 2960).

### F. The Individual Claim of Mollie White (LR–C–79–235)

1. Ms. Mollie White, a black female, was hired by the City in its Model Cities Program in 1969 as a Community Organizer, and in 1970 she was made a Program Evaluator (DX 49). On August 20, 1973 she was transferred to Management and Program analysis, and on July 21, 1975 to Management Support where she was located with the Planning Department.

2. On September 23, 1975 she applied for Program Analyst, a position received by Calvin Brown, a black male (DX 49). This is the only promotion she sought while employed by the City.

3. The complaint in this case was filed May 23, 1979 alleging race and sex discrimination pursuant to 42 U.S.C. §§ 1981, 1983, which makes the relevant time frame for these causes of action subsequent to May 23, 1976. Her EEOC complaint was filed November 15, 1979, which makes the Title VII time frame a period subsequent to May 15, 1979. The 1975 promotion which she sought is thus outside all relevant time frames.

4. On July 13, 1976 Ms. White asked about upgrade of her position. Her supervisor forwarded her request to the Personnel Department, which after the audit did not recommend an upgrade. In her testimony Ms. White does not question this

decision. Her main complaint centers around her failure to receive an upgrade in 1979.

5. In 1977 Mr. Nathaniel Griffin was brought in by the City to reorganize and improve the City's Planning Department. (T. 3174, 3272; DX 246.) Many of the positions in the Planning Department were reclassified and upgraded. At that time the Model Cities Program was being phased out, and Ms. White's job as Program Evaluator was much at risk. She had little work to do, but in order to save her job, Griffin identified duties which she might perform that would contribute to the support of his professional staff (T. 3276). These duties included answering the telephone, making copies, assembling reports, and similar clerical duties (T. 2992, 3293–94).

6. Mr. Griffin affirmatively requested that Ms. White be assigned to his staff as a Planning Technician, grade F–6, in his September 23, 1977 Memo to City Manager (DX 51). The creation of this new position was previously discussed with and approved by Mahlon Martin in an October 3, 1977 Memo to Ann Sell (DX 51). Ms. Ann Sell reviewed the request and proposed duties and responsibilities and determined that the grade of F–6 was appropriate (DX 51—Note to J.C. Denny, 10/5/77 Classification Report). This recommendation was reviewed and approved by Mr. Griffin, Mr. Denny, the Personnel Director, and Mahlon Martin, who signed for the City Manager (DX 51—10/5/77 Classification Report).

7. In light of all the evidence, the decision to assign the grade of F–6 to the Planning Technician position created for Mollie White was done for legitimate business reasons, and there is no evidence that racial or sexual bias played any part in the decision.

8. Ms. White's complaint is that when others in the department were being upgraded, she should have also been upgraded. However, this contention overlooks the fact that neither the complexity or difficulty of her job changed when she was retained in the Planning Department under a job title as Planning Technician. (T. 3280.)

Ms. White did not have a technical background in the area of land planning (T. 3289).

9. In January of 1979 Ms. White approached Griffin about an upgrade of her position. Mr. Griffin was not sanguine about her request being granted, but he referred her request to the Personnel Department for a job audit (T. 2995). The audit was performed by Ms. Mary Ann Deramus, Personnel Analyst who testified at length in the trial (T. 3118). I was impressed by the competence and objectivity of Ms. Deramus (T. 2965, 2966, 3104–52). After the audit, she recommended no change in the grade (T. 2996, 3119). Mr. Griffin made no attempt to influence her decision in any manner whatsoever (T. 3118).

10. I find no evidence that the job audit was conducted in a biased, discriminatory manner. I further find that Ms. White was shown a great deal of consideration by Mr. Griffin, head of the department. (T. 3276, 3282, 3284, 3285, 3286.)

11. Although Ms. White implied that Griffin is biased against women and blacks, she admitted that he hired Bernadette Beland, a black as subdivision administrator, a grade F–10 job, and Ann Razer, a white woman, as a planner, grade F–10 (White Ex 8). Ms. White was replaced by Ms. Ann Brown, a black female. At any rate, the decision with regard to the upgrade was initially made by Mary Ann Deramus, a white female.

12. Ms. White resigned her job on January 3, 1984. In her letter of resignation, she stated that she had enjoyed her work in the Planning Department.

13. The Court finds no credible evidence that the failure of Ms. White to receive an upgrade was the result of discrimination related to race or sex.

### G. The Individual Claim of Jesse MacHenry Johnson (Intervenor in LR–C–80–44)

1. Jesse MacHenry Johnson filed his motion to intervene and his complaint in intervention on June 1, 1982. Intervention

was permitted on June 23, 1982. The relevant time frame under 42 U.S.C. §§ 1981 and 1983 thus begins on June 23, 1979.

2. Mr. Johnson filed his EEOC complaint on May 2, 1980. The time frame for his Title VII complaints begins November 2, 1979.

3. Mr. Johnson was first hired by the City as a Laborer in the Sanitation Department on January 13, 1970. (T. 2414–15; Form P–2 dated 1/13/70 in DX 47.) He was promoted to the position of Cost Accounting Clerk, Grade F–4 on December 18, 1972. (Form P–2 dated 12/22/72 in DX 47.) He was transferred to the Vehicle Maintenance Division of the newly-created Department of General Services on January 1, 1974, retaining the same job title and grade. (Form P–2 dated 12/6/73 in DX 47.) He worked in the old sanitation garage from that date until 1979 when he was reassigned to work in the Parts Room at Central Garage. He has worked in that position under the general supervision of Mr. Harold Hughes from that date to the present. On January 14, 1980 the title of his job was changed to Office Assistant II, but the grade remained F–4. (Form OP–4 dated 1/21/80 in DX 47.)

4. No reasonable basis existed for a reclassification upgrade of Johnson's job when the job title was changed on January 14, 1980 (DX 239; T. 3436). His job duties consisted mainly of answering the radio and telephone (T. 3399). There is no evidence that failure to upgrade the job was based on racial considerations (T. 3116–17).

5. Mr. Johnson has applied for a number of positions since his employment with the City. All are outside the relevant time frame except an application he made for Assistant Vehicle Maintenance Supervisor in 1980. I find that Mr. Johnson was patently unqualified for this job. (T. 3063, 3401; DX 229 and 290.) He made the lowest test score (20%; passing score, 69%) of the 62 applicants who took the test for the job (DX 205, DX 230), which requires considerable experience in all fields of vehicle mechanics (DX 229; T. 3400–01). This is the second ranking position in the City's department having responsibility for the maintenance and repair of the City's large fleet of vehicles (T. 3065). Mr. Johnson's experience as an automobile mechanic was derived principally from working on his own car (T. 3063; DX 231).

6. The job of Assistant Vehicle Maintenance Supervisor went to Mr. Al Carrington who had 30 years of experience as a full-time vehicle mechanic—ten years with the City and 20 years with the Air Force (T. 3065–66, 3401). Carrington had attended numerous schools on vehicular mechanics while in the Air Force and in the employ of the City (T. 3066). He is exceptionally well qualified in every aspect of vehicle maintenance and repair (DX 232).

7. The positions for which Johnson applied outside the relevant time frame for the most part went to blacks. In the test for a Sanitation Dispatcher for which he applied on January 25, 1979 (T. 3066; DX 233 and 234), Johnson received a grade of 27% on a written test whose passing score was 85% (DX 204). A black was hired for this position (T. 3067; DX 233 and 234). Johnson applied for the position of code enforcement officer, which went to a black (T. 3069; DX 235 and 236).

8. Mr. Johnson has failed to establish that he was qualified for any of the above jobs or that race played any part in his failure to receive them.

### H. Claim of Powell Tidwell

1. Powell Tidwell, the black foreman at the Hindman Golf Course who was discharged on August 4, 1981, petitioned to intervene in this case. I denied the intervention of Tidwell on May 11, 1982, but plaintiffs presented considerable testimony about alleged discriminatory acts toward Tidwell.

2. The Court finds that Tidwell's discharge was justified and was not racially motivated. Tidwell was responsible for the condition of the Hindman Golf Course, and the testimony is overwhelming that he permitted the course to deteriorate into a deplorable condition (T. 2833, 3215, 3323, 3317). Tidwell claimed that Steve Smith, the golf course supervisor, harassed him (T. 2818–22). I find that Smith justifiably

criticized Tidwell for poor job performance (T. 2835–40).

3. Tidwell claimed that Steve Smith made salacious comments concerning Tidwell's white wife (T. 2819). Smith denied these allegations, and there is no independent corroboration (T. 3222).

4. Tidwell also claimed that Smith for racial reasons did not want to ride in the car with him to a Turf Conference in another state (T. 2823). These allegations were not substantiated, and the proof was that blacks and whites did ride together to the conference (T. 2875, 3220).

5. Tidwell claimed that Steve Smith harassed him, but there is no corroboration by third parties to these allegations, and Smith denied these allegations (T. 3222).

6. Tidwell filed a grievance over his discharge but failed to appear for the grievance hearing (T. 2843), even though he was permitted to file his grievance after time had expired (T. 3172).

7. Tidwell testified that he had received all the promotions he had sought (T. 2831); his claim therefore had no bearing on the promotion class.

8. City Manager Mahlon Martin did not tell Tidwell that if he had followed through on his grievance, Martin would have reinstated him as foreman (T. 3172).

9. I find that no credible evidence was presented that Tidwell was the subject of discrimination on account of his race.

### III.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of these consolidated causes.

2. The authorities cited in *Hervey v. City of Little Rock supra* at 55–56 are applicable to decertification of subclasses one (promotions) and three (terms and conditions of employment). The plaintiffs have failed to make a *prima facie* case as to either subclass.

3. All events which occurred prior to the relevant time frame in the stipulated class certification order cannot provide the basis for liability. While such events may be considered as background evidence, they are not in and of themselves evidence of classwide discrimination. *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Movement for Opportunity and Equality v. General Motors*, 622 F.2d 1235 (7th Cir. 1980).

4. There are two types of claims cognizable under Title VII—disparate treatment and disparate impact. The latter embraces use of neutral rules, policies, and regulations having a disproportionate impact. *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

5. Rules having a disproportionate impact are illegal unless justified. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiffs here must initially show that a racially neutral employment rule or policy affected their promotion or the terms and conditions of employment. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Here the plaintiffs have completely failed to demonstrate that any rule or policy or test of the City has adversely impacted on the class during a relevant time period. In fact, plaintiff's own expert admitted that there had been no adverse impact during the stipulated time frame. In order to spell out a questionable case of adverse impact, plaintiff's expert had to reach far beyond the stipulated time frame. He also had to include "reclassifications," a category not within the stipulation.

6. In the liability phase of a class action for disparate treatment under Title VII, plaintiffs must prove by a preponderance of the evidence that the defendant engaged in a pattern or practice of unlawful discrimination in various City policies, that "discrimination was the [City's] standard operating procedure—the regular rather than the unusual practice." *Teamsters v. United States, supra*, 431 U.S. at 336, 97 S.Ct. at 1855. Plaintiffs have not carried their burden of proof on this issue by either statistical or anecdotal proof or by the proof adduced on behalf of the

individual plaintiffs. As a matter of fact, the proof in this case has established the contrary proposition. In deciding this issue, I have considered all the class proof as well as the proof of the individual plaintiffs. *Craik v. Minnesota State University Board, supra.*

7. "The principles for the order and allocation of proof outlined in *McDonnell Douglas v. Green,* 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] for Title VII claims of disparate treatment are also applicable to disparate treatment claims brought pursuant to 42 U.S.C. § 1981." *Kenyatta v. Bookey Packing Co.,* 649 F.2d 552, 554 (8th Cir.1981).

8. The "factual inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The same inquiry must be made in a case under 42 U.S.C. § 1981. "To prevail on a claim under 42 U.S.C. § 1981, the plaintiff must present evidence of defendant's discriminatory intent, as that section reaches only purposeful discrimination." *Taylor v. City of St. Louis,* 702 F.2d 695, 697 (8th Cir.1983) citing *General Building Contractor's Ass'n v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In the latter case the court said: "We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination." The court later referred to "our holding that § 1981 can be violated only by intentional discrimination." *Id.* at 391, 102 S.Ct. at 3150. I find nothing in this record to indicate purposeful or intentional discrimination by the City of Little Rock in the relevant time frame with respect to either the class or the individual claimants.

■ 9. With respect to the Title VII disparate treatment individual claims of the plaintiffs and intervenors, the Supreme Court has established a model for the establishment of a *prima facie* case in a private, non-class disparate treatment Title VII action. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 800, 93 S.Ct. at 1823. The plaintiff must prove that he or she belongs to a protected class and applied for an available position for which he or she was qualified but was rejected under circumstances which allow the court to infer unlawful discrimination. *Id.* at 802, 93 S.Ct. at 1824. Once the *prima facie* case is made out, the burden of production shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. "If the defendant carries its burden, thus raising a genuine issue of fact, the presumption of illegal discrimination drops from the case. The plaintiff at all times retains the burden of persuasion and must prove by showing that the defendant's explanation was not the true reason for the employment decision that he or she was the victim of intentional discrimination." *Craik v. Minnesota State University Board, supra* at 469, citing *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95. As noted in conclusion No. 7, *supra,* the same allocations of proof are applicable in a § 1981 case. Under these tests none of the individual plaintiffs or intervenors in their individual cases or individual intervention have made a case for disparate treatment under Title VII or a case under 42 U.S.C. § 1981.

10. With respect to the Title VII disparate impact claims of plaintiffs and intervenors, the Supreme Court has also established a model for the presentation of proof. The plaintiff must show that a facially neutral rule disproportionally excludes from employment members of his or her Title VII protected group. The defendant employee may respond by proving "business necessity," that is, the employer may demonstrate that the neutral rule is "job related." The plaintiff can prevail over defendant's rebuttal by showing that the employer's goals can be served by an alternative exclusionary neutral rule. *Albemarle Paper Co. v. Moody, supra,* defining requirements of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

11. "The prima facie case method established in *McDonnell Douglas* was 'never

intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.' *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957] (1978). Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.' *Burdine, supra* [450 U.S.] at 253 [101 S.Ct. at 1093]." *U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

12. The job description and specifications imposed in the South End Coordinator position for which Estella Robinson applied (DX 262) were bona fide occupational qualifications and did not discriminate against her on the basis of sex. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). All the persons involved in this employment decision were black, and a black male ultimately received this position, so race discrimination was not a viable contention in Ms. Robinson's case. Her Title VII claims with regard to this promotion are not tenable because the events in question occurred more than 180 days prior to the filing of her EEOC charge. Her claim of sex discrimination under 42 U.S.C. § 1983 (the only possible claim she might maintain) requires proof of purposeful discrimination. I find that she has failed to sustain her ultimate burden of proof in this regard. "The issue of discriminatory intent is common to analyses under the Fourteenth Amendment and Title VII. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (referring to 'the basic equal protection principle that the invidious quality of a law claimed to be facially discriminatory must ultimately be traced to a racially discriminatory purpose.')" *Craik v. Minnesota State University Board, supra* at 468, n. 5.

13. I find that Mollie White was not upgraded or her job reclassified because her job duties and responsibilities did not justify this change in her job status. At her request, her job was submitted to a fair and impartial audit, and upgrade and reclassification was denied. The reasons given by the City for this job decision were not pretextual.. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981). She has failed to prove intentional discrimination under 42 U.S.C. §§ 1981 and 1983. *Craik v. Minnesota State University Board, supra.*

14. Leo Anderson was not the object of discrimination on account of race. He was not promoted to foreman at the Hindman Golf Course because he did not apply for this position. He was transferred to the War Memorial Golf Course for legitimate business reasons. His race was in no way involved in this transfer. Anderson has failed to demonstrate an intent to discriminate against him under 42 U.S.C. § 1981, 1983, and 2000e. *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

15. Jesse MacHenry Johnson was not the object of intentional discrimination because of race. His race played no part in the various employment decisions which the City made with reference to promotion applications and discipline. Johnson did not receive upgrades and promotions because he was lacking in the requisite qualifications. *Texas Department of Community Affairs v. Burdine, supra.*

16. Robert Walker has not been the subject of discrimination on the part of the City. Mr. Walker was injured on the job, and his case has at all times been handled according to the provisions of the Arkansas Workers' Compensation Act. Under this Act an employer is not obligated to return an employee to work who can only perform light duty. If an employer has no "light duty," the injured claimant continues to draw Workers' Compensation benefits. *Easton v. H. Boker & Co.,* 226 Ark. 687, 292 S.W.2d 257 (1956). The City has offered this plaintiff a position commensurate with his physical abilities which plaintiff has rejected, and he is now drawing total disability benefits. I find no evidence whatsoever of discrimination on the ground

of race in violation of 42 U.S.C. §§ 1981, 1983, and 2000e.

17. I find that Robert Hervey was promoted to Vehicle Mechanic as soon as he was qualified to do the work required by this position. He was not the subject of discrimination under the provisions of 42 U.S.C. §§ 1981, 1983 and 2000e. He has no justifiable complaint against the City of Little Rock under any of these statutory provisions. *McDonnell Douglas Corp. v. Green, supra.*

18. Stipulated subclasses (1) and (3) as originally certified in *Hervey v. City of Little Rock*, No. LR–C–80–44, should be decertified.

19. The individual claims of Robert Hervey, Robert Walker, Leo Anderson, Jesse M. Johnson, Jr., Mollie White, and Estella Robinson should be denied and dismissed.

20. Judgment should be entered for the defendants decertifying the entire class originally certified in *Hervey v. City of Little Rock*, No. LR–C–80–44, and on behalf of the defendant City of Little Rock in all the individual claims and interventions which have been consolidated with *Hervey v. City of Little Rock, supra.*